

BENJAMIN B. WAGNER
United States Attorney
JEFFREY A. SPIVAK
HEATHER MARDEL JONES
Assistant United States Attorneys
United States Courthouse
2500 Tulare Street, Suite 4401
Fresno, California 93721
(559) 497-4000 Telephone
(559) 497-4099 Facsimile

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>APPROXIMATELY $30,000.00 IN U.S. CURRENCY,<br><br>Defendant. | 1:13-CV-01542-LJO-GSA<br><br>**ORDER REGARDING CLERK'S ISSUANCE OF WARRANT FOR ARREST OF ARTICLES *IN REM*** |

WHEREAS, a Verified Complaint for Forfeiture *In Rem* has been filed on September 24, 2013, in the United States District Court for the Eastern District of California, alleging that the defendant approximately $30,000.00 in U.S. Currency (hereafter "defendant currency") is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) for one or more violations of 21 U.S.C. §§ 841 *et seq.*;

And, the Court being satisfied that, based on the Verified Complaint for Forfeiture *In Rem* and the affidavit of Deputized Task Force Agent Robert Perez, there is probable cause to believe that the defendant currency so described constitutes property that is subject to forfeiture for such violation(s), and that grounds for the issuance of a Warrant for Arrest of Articles *In Rem* exist, pursuant to Rule G(3)(b)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions;

///

1  IT IS HEREBY ORDERED that the Clerk for the United States District Court,
2  Eastern District of California, shall issue a Warrant for Arrest of Articles *In Rem* for the
3  defendant currency.

4  Dated: 11/8/13

STANLEY A. BOONE
United States Magistrate Judge

## AFFIDAVIT OF ROBERT PEREZ

I, Robert Perez, being first duly sworn under oath, depose and say:

1. I am a Deputized Task Force Agent for the Drug Enforcement Administration (DEA), assigned to the High Intensity Drug Trafficking Area group (HIDTA), and have been so assigned since December, 2008. I have been employed with the Fresno County Sheriff's Office since March 2001. Prior to this assignment, I was assigned to the Fresno County Sheriff Narcotics Enforcement Team for nearly two years. My law enforcement training began in July, 2007, when I attended the Police Academy at the State Center Community College District Regional Training Facility in Fresno, California. This course was over 23 weeks long from July, 1997, through December, 1997, and consisted of basic police and criminal law training. I have received special training in the methods used by drug traffickers to illegally produce, transport, and distribute marijuana and other controlled substances. I am familiar with, and have participated in, all the formal methods of investigations, including but not limited to, electronic surveillance, visual surveillance, general questioning of witnesses, search warrants, confidential informants, and the use of undercover agents. I have participated in investigations involving organizations trafficking in controlled substances. Based on my experience and training I have acquired from drug enforcement schools and from working with other Special Agents and Detectives, I am providing the following facts.

2. During my career, I have conducted or participated in controlled substance investigations involving, inter alia, conspiracies to distribute controlled substance (21 U.S.C. 841 (a) (1) and 846) and the manufacture and possession of controlled substances with the intent to distribute (21 U.S.C. 841 (a) (1)). These investigations targeted large scale drug trafficking organizations engaged in the sale, manufacture, importation, and distribution of heroin, methamphetamine, cocaine, and other controlled substances. During the course of my work, I have had the opportunity to converse with admitted and known drug traffickers as to their methods, and those of their associates, regarding the manufacture, importation, transportation, distribution and sales of controlled substances,

1  as well as their methods used to conceal, transport, and launder cash and/or other types of
2  drug proceeds. I have become knowledgeable in the methods used by drug traffickers to
3  import, conceal, transport, distribute, manufacture, and sell controlled substances, as well
4  as their methods used to conceal, transport, and launder cash and/or other types of drug
5  proceeds.

6  3.  Through prior investigations and training, I have become familiar with the
7  types and amounts of profits made by drug dealers, and the methods, language, and terms
8  that are used. I am aware that drug traffickers often communicate with their drug
9  trafficking associates through the use of electronic communication devices. In addition, I
10 am aware that drug traffickers frequently use multiple electronic communication devices. I
11 know from my training and experience that drug traffickers often use fictitious names and
12 identification for the purpose of subscribing to electronic communication devices. I also
13 know from my training and experience that drug traffickers also put communication devices
14 in the names of associates or relatives is designed to impede law enforcement investigations
15 into the true subscriber and/or user of such communication devices.

16 4.  This affidavit is made in support of a warrant for arrest of defendant
17 approximately $30,000.00 in U.S. Currency ("the defendant currency"). The defendant
18 currency constitutes a thing of value furnished or intended to be furnished in exchange for a
19 controlled substance or listed chemical, and is proceeds traceable to such an exchange, and
20 was used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841, *et*
21 *seq*.

22 5.  The facts set forth in this affidavit are known to me as a result of reviewing
23 official reports, documents, and other evidence obtained as a result of the investigation, and
24 through conversations with other agents and detectives who have participated in this
25 investigation and I have determined the following:

26 6.  On February 20, 2013, at approximately 11:09 a.m., Fresno County Sheriff
27 detectives were working on Interstate 5 in Fresno County, California. Both detectives were
28 riding together in a marked patrol vehicle traveling southbound on I-5 when they noticed a

1 red Ford Explorer (Oregon License #649CNU).

2     7.    As they passed the Explorer, they noticed a GPS unit attached to the center of the windshield and a cracked windshield. The detectives slowed down and allowed the Explorer to pass and then initiated the stop. They initiated a vehicle stop on the Explorer for the GPS being affixed to the center of the windshield and the cracked windshield.

    8.    The detectives identified the driver as Marcus Valencia (hereafter "Valencia") and the passenger as Alfonso Ramos (hereafter "Ramos").

    9.    The detective advised Valencia and Ramos of the reason for the stop and asked Valencia for his driver's license, registration, and proof of insurance. Ramos quickly advised that the vehicle belonged to him and that he purchased the Explorer the day before in Hillsboro, Oregon for $2,500.

    10.    The detective asked Valencia and Ramos where they were going and they both said Los Angeles. As Valencia and Ramos gathered the documentation, the detective could smell a strong odor of air freshener emitting from inside the vehicle and then saw two air fresheners hanging from the ceiling near the cargo area of the Explorer. The detective also observed a single ignition key in the ignition.

    11.    Based on training and experience, detectives know that air fresheners are also commonly seen in vehicles used for smuggling contraband such as narcotics or currency, as a masking agent, in the event a narcotic canine is introduced to the vehicle. Based on the detective's training and experience, detectives also know that persons involved in smuggling contraband will commonly not have any of their own keys on the key ring to the vehicle. This is because the trip is a pre-planned event in a vehicle that does not belong to the driver or passengers. Vehicles used for smuggling contraband are commonly only used for that purpose and the driver will not typically leave his or her other keys on the same ring. Further, Ramos's statement that had purchased the Explorer the day before was likely designed to explain away the fact that the registered owner was listed as someone else, here, Osio Estevez from Forest Grove, Oregon.

    12.    While any one of the above indicators may not alone be suspicious, the

combination of the indicators led the detectives to believe Valencia and Ramos might be smuggling contraband.

13. The detective asked Valencia to exit the Explorer and accompany him to the patrol vehicle. Valencia complied. At the patrol vehicle, Valencia said that he and his cousin, Ramos, left Vancouver, Washington the night before at about 10:00 p.m. Valencia said they were planning to stay in Los Angeles until the weekend. The detective had Valencia standby with the second detective while he walked over to the Explorer to speak to Ramos.

14. Ramos told a different story about where he and Valencia had come from and how long they intended to stay in Los Angeles. Ramos told the detective that he and Valencia had come from Hillsboro, Oregon the night before. He told the detective that they planned to stay in Los Angeles for a day and then to head home the following evening.

15. At about 11:18 a.m., the third detective responded to the scene and assisted on the traffic stop. Based on the multiple air fresheners, the single key in the ignition, the third party registered owner, and the inconsistent statements given by the Valencia and Ramos, the detective asked for consent to search the Explorer. Both Valencia and Ramos consented. The detective asked both occupants if there were any weapons, narcotics or large sums of money in the Explorer and both said no. Both Valencia and Ramos were asked to exit the vehicle.

16. The detectives then utilized a narcotic detection canine to conduct an exterior and interior sniff of the Explorer for the odor of narcotics. The canine gave a positive alert to the odor of narcotics to the exterior rear cargo area of the Explorer. The canine also gave a positive alert to the interior cargo area and the center console area of the Explorer.

17. The canine used in this case is Cody who is an eight year old Labrador Retriever and has been extensively trained as a Narcotic Detection K-9. Cody has been employed by the Fresno County Sheriff's Office since October 2005. Cody was first assigned to Det. Courtney Williams from October 2005 to February 2007. Cody was next assigned to Det. Rod Lucas from March 2007 to March 2008. Since March 2008, Det. Ramiro Rodriguez

has been Cody's handler.

18. For a drug-detecting canine to become certified, the canine goes through one or more certification processes. The fundamental purpose of a certification process is to determine (1) whether the canine recognizes the odors of marijuana, cocaine, heroin, methamphetamine, and opium; (2) whether the canine responds to those odors; and (3) whether the handler recognizes the canine's responses. As part of this process, the canine is also tested or "proofed" against non-narcotic items to determine whether the canine alerts to odors such as food, plastics, cotton, currency, etc.

19. Cody was first certified in 2005 in the detection of the odor emanating from narcotics through the California Narcotic Canine Association and thereafter has been certified yearly. Cody was first trained in 2005 at Master K-9 for his initial assignment to Det. Williams. Then, in 2007, Cody received training at Master K-9 for his assignment to Det. Lucas. As sated above, Cody received training at Master K-9 in 2008 with Det. Rodriguez.

20. Every year since the initial certification, Cody has been re-certified by the California Narcotic Canine Association. Since Det. Rodriguez' initial assignment with Cody, they were certified in May 2008 and have been re-certified each year since. The re-certification process tests the detection of marijuana, cocaine, heroin, and methamphetamine.

21. Cody has been training to detect the scent of the following narcotics: marijuana, cocaine, methamphetamine, opium and heroin. Cody has alerted to areas found to contain various amounts, from a few grams to numerous pounds.

22. As part of his care and maintenance, Cody engages in weekly training approximately four (4) hours in length. Often, he engages in training more than once a week. Cody is training both individually and with the Fresno County Sheriff's Office canine officers as a unit. Approximately once a week Cody and Det. Rodriguez trainings with a certified trainer from Vigilant Canine Service International (V.C.S.I.). During Det. Rodriguez' handling of Cody, Cody has competed in law enforcement canine competitions

and won various awards.

23. During his weekly training, Det. Rodriguez "proofs" or tests Cody with various substances to ensure that he alerts only to the odor of narcotics. Food items, plastic wrap (commonly used by drug traffickers to wrap narcotics and currency) and other items which drug traffickers often employ to attempt to mask the odor of narcotics such as dryer sheets and air fresheners. To that end, on a weekly basis in our training Det. Rodriguez proofs Cody using currency, both uncirculated currency obtained from the United States Mint, as well as circulated currency, to test whether he alerts to the odor of currency or to any alleged trace odors of narcotics on currency. He does not.

24. The training records maintained for Cody reflect his weekly training, but do not include the time involved in street deployments which provide Cody with additional experience and training. Street deployments are instances when Cody and his handler are called upon to go out as part of a law enforcement investigation, so that he can perform a "sniff" for the odor of the various narcotics to which he is trained to alert. A conservative estimate is that Cody is involved in approximately 200 to 400 street deployments each year, in the seven years he has been in service.

25. Detectives conducted a hand search of the Explorer. Detectives located five bundles of currency inside the center console. Each bundle was rubber-banded and wrapped in light green cellophane. The detective asked Ramos and Valencia if the bundles of currency belonged to them. Ramos said the currency belonged to him. Ramos was asked how much currency was in the bundles and Ramos said about $10,000.

26. Ramos was asked why he had so much currency and he answered that he planned to buy a classic Chevy Impala while in Los Angeles. Ramos was asked from where the currency came and Ramos said from his job and his tax return. He failed to explain why he had purchased the Explorer the day before if he intended to buy a second car when he arrived in Los Angeles.

27. Ramos was then asked the source of the currency, and Ramos said he just received $7,000 from his tax return and that he also makes money on the side from painting

1  cars.

2  28.  A detective then located an additional bundle of currency hidden under a plastic panel of the center console near the gear shift. It was also rubber-banded and wrapped in light green cellophane. The bundle was identical to the bundles located inside the center console. The detective advised Ramos of the additional bundle of currency located near the gear shift. Ramos said, "Oh yeah, I forgot about that one." Ramos was told that it appeared there was more than $10,000. Ramos said he was not really sure how much currency was there, but believed it may be closer to $20,000.

29.  Ramos was asked if he put the currency in the Explorer and if he wrapped the currency in plastic. Ramos said yes. Ramos said he wrapped the currency in plastic because it was too loose and scatters all over the place. Ramos was asked if there were any more bundles that they should know about and Ramos said he did not think so. Ramos then said that because he purchased the Explorer the day before, he did not necessarily know what else may be in the Explorer.

30.  Valencia and Ramos were advised that the money was being seized due to detectives' belief that the currency was related to narcotics trafficking. Valencia said the currency did not belong to him and signed a Disclaimer of Currency form which was explained to him. Ramos was issued a receipt for the currency.

31.  Ramos said he works for an auto body shop in Portland, Oregon and that he made about $40,000 and about $55,000 in 2011. Ramos said the amount of money he makes depends on how many cars he works on. Ramos said he also makes money on the side by painting cars. Ramos said he painted three or four cars in 2012. Ramos was asked what he charges to paint a car and Ramos said anywhere from $2,000 to $3,000.

32.  Valencia, Ramos, and the Explorer were released without further incident.

33.  Based on the detectives' training and experience, the manner in which the currency was concealed is consistent with the manner narcotic traffickers transport their currency and narcotics. The manner in which the currency was concealed and packaged led the detectives to believe that the currency was wrapped in cellophane to avoid detection by

7            Affidavit of Robert Perez

the narcotic detection canine and law enforcement. The fact that Ramos first stated there was $10,000 in the Explorer, then stated it may be $20,000 and prior to being released he stated it may be closer to $30,000, led the detectives to believe he was transporting the currency for someone else.

34. The currency was in the following denominations: 35 x $100 bills, 16 x $50 bills, 1,259 x $20 bills, 48 x $10 bills, and 8 x $5 bills.

35. Based on the evidence presented in this affidavit, it is my opinion that the currency described in this Affidavit are proceeds from criminal offenses or used to facilitate such criminal offenses, as described with more particularity above.

36. "[T]he filing of the forfeiture complaint allows the government immediately to obtain a warrant for the arrest of the res, without any further showing of probable cause. Indeed, arrest of the res is a jurisdictional requirement." <u>United States v. $191,910.00 in United States Currency</u>, 16 F.3d 1051 (9th Cir. 1994).

37. Based on the above, I believe there is probable cause to indicate that the defendant currency constitutes a thing of value furnished or intended to be furnished in exchange for a controlled substance or listed chemical, and is proceeds traceable to such an exchange, and was used or intended to be used to facilitate one or more violations of 21 U.S.C. § 841, *et seq.*, and that a Warrant for Arrest of Articles *In Rem*, pursuant to the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions Rule G(3)(b)(i), be issued for the defendant currency.

ROBERT PEREZ
Deputized Task Force Agent
Drug Enforcement Administration

Sworn to and Subscribed before me this ___ day of November 2013.

Honorable Stanley A. Boone
United States Magistrate Judge

Reviewed and approved as to form.

_____
Heather Mardel Jones
Assistant U.S. Attorney