UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br><br>APPROXIMATLEY $30,000.00 in U.S. Currency,<br><br>　　　　　　Defendant. | 1:13-cv-1542 GSA<br><br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE THE CLAIM AND ANSWER OF ALFONSO RAMOS AND GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**<br><br>**(Doc. 26)** |

**INTRODUCTION**

In this *in rem* forfeiture action, Plaintiff United States of America (the "Government" or "Plaintiff") filed a Motion to Strike the Claim and Answer of Alfonso Ramos ("Claimant") on the basis that the Claimant did not provide Court ordered discovery. (Doc. 26). In the motion, the government also seeks an entry of default judgment against Alfonso Ramos and a final judgment of forfeiture against all known and unknown potential claimants to the $30,000.00 in U.S. currency ("Defendant Currency"). In response to the Motion, the Claimant's attorney filed a

1

declaration which the Court has considered. The matter was taken under submission without oral argument pursuant to Local Rule 230(g) and the hearing set for this matter was VACATED. For the reasons set forth below, the Court GRANTS the Government's motion.[1]

## SEIZURE OF THE DEFENDANT CURRENCY [2]

The Verified Complaint for Forfeiture *In Rem* (hereafter "Complaint") filed on September 24, 2013, alleges that the defendant currency was used, or was intended to be used, in any manner or part to commit or facilitate the commission of a violation of 21 U.S.C. § 841 *et seq*. and is therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6). (Doc. 1 at pg. 1).

More specifically, on February 20, 2013, at approximately 11:09 a.m., Fresno County Sheriff detectives were working on Interstate 5 in Fresno County, California. Both detectives were riding together in a marked patrol vehicle traveling southbound on I-5 when they noticed a red Ford Explorer (hereinafter, "Explorer"). (*Id*. at pg. 2).

As they passed the Explorer, they noticed a GPS unit attached to the center of the windshield and that the windshield was cracked. The detectives slowed down and then initiated a stop. They initiated a vehicle stop based on the above violations. *Id*.

The detectives identified the driver as Marcus Valencia (hereafter "Valencia") and the passenger as Alfonso Ramos (hereafter "Ramos"). The detective advised Valencia and Ramos of the reason for the stop and asked Valencia for his driver's license, registration, and proof of insurance. Ramos quickly advised that the vehicle belonged to him and that he purchased the Explorer the day before in Hillsboro, Oregon for $2,500. *Id*.

The detective asked Valencia and Ramos where they were going and they both said Los

---

[1] The parties have consented to Magistrate Judge jurisdiction in this case. *See*, Docs. 13 & 14.

[2] These facts are taken from the verified compliant filed on September 24, 2013. (Doc. 1).

Angeles. As Valencia and Ramos gathered the documentation, the detective could smell a strong odor of air freshener emitting from inside the vehicle, and then saw two air fresheners hanging from the ceiling near the cargo area of the Explorer. The detective also observed a single ignition key in the ignition. *Id*. at pg. 2-3.

Based on their training and experience, the detectives suspected that the car may contain illegal contraband because multiple air fresheners are commonly seen in vehicles used for smuggling narcotics or currency, as a masking agent, in the event a narcotic canine is introduced to the vehicle. Additionally, based on their training and experience, the detectives were suspicious of the fact that there was only one key on the driver's key ring because vehicles used for smuggling contraband are commonly used only for that purpose; the driver will not typically leave his or her other keys on the same ring. Further, the officer's suspected Ramos' statement that had purchased the Explorer the day before was likely designed to explain away the fact that the registered owner was listed as someone else, here, Osio Estevez from Forest Grove, Oregon. While any one of the above indicators may not have raised suspicions alone, the combination of the indicators led the detectives to believe Valencia and Ramos may be smuggling contraband. *Id*. at pg. 3.

The detective asked Valencia to exit the Explorer and accompany him to the patrol car. Valencia complied. At the patrol vehicle, Valencia said that he and his cousin, Ramos, left Vancouver, Washington the night before at about 10:00 p.m. Valencia said they were planning to stay in Los Angeles until the weekend. The detective had Valencia stand by with the second detective while he walked over to the Explorer to speak to Ramos. *Id*.

Ramos told a different story about where he and Valencia had come from and how long they intended to stay in Los Angeles. Ramos told the detective that he and Valencia had come from Hillsboro, Oregon the night before. He stated that they planned to stay in Los Angeles for a

3

day, and then to head home the following evening. *Id*.

At about 11:18 a.m., a third detective responded to the scene and assisted with the traffic stop. Based on the multiple air fresheners, the single key in the ignition, the third party registered owner, and the inconsistent statements given by Valencia and Ramos, the detective asked for consent to search the Explorer. Both Valencia and Ramos consented. The detective asked both occupants if there were any weapons, narcotics, or large sums of money in the Explorer and both said no. Both Valencia and Ramos were asked to exit the vehicle. *Id*. at pg. 3-4.

The detectives utilized a narcotic detection canine to conduct an exterior and interior sniff of the Explorer for the odor of narcotics. The canine gave a positive alert to the odor of narcotics to the exterior rear cargo area of the Explorer. The canine also gave a positive alert to the interior cargo area and the center console area of the Explorer. *Id*. at pg. 4.

Detectives conducted a hand search of the Explorer. Detectives located five bundles of currency inside the center console. Each bundle was rubber-banded and wrapped in light green cellophane. The detective asked Ramos and Valencia if the bundles of currency belonged to them. Ramos said the currency belonged to him. Ramos was asked how much currency was in the bundles and Ramos said about $10,000. *Id*.

Ramos was asked why he had so much currency and he answered that he planned to buy a classic Chevy Impala while in Los Angeles. When Ramos was asked where the currency came from, he stated that it was from his job, and that he just received $7,000 from his tax return.

A detective then located an additional bundle of currency under a plastic panel of the center console near the gear shift. It was also rubber-banded and wrapped in light green cellophane. The bundle was identical to the bundles located inside the center console. The detective told Ramos about the additional bundle of currency located near the gear shift. Ramos said, "Oh yeah, I forgot about that one." Ramos was advised that it appeared there was more than

4

$10,000 in currency in the vehicle. Ramos said he was not really sure how much currency was there, but he believed it may be closer to $20,000. *Id*. at 4-5. Ramos was asked if he put the currency in the Explorer and if he wrapped the currency in plastic. Ramos stated that he had, and that he wrapped the currency in plastic because it was too loose and scattered all over the place. *Id*. at pg. 5.

When asked if there were any more bundles that they should know about, Ramos said he did not think so. Ramos then said that because he purchased the Explorer the day before, he did not necessarily know what else may be in the Explorer. His inconsistency between remembering packing the money, yet, on the other hand, not remembering how much money he had packaged, or where in the vehicle the money was located raised suspicions that the money was related to narcotics activity. *Id*. at pg. 5.

Valencia and Ramos were advised that the money was being seized due to the detectives' belief that the currency was related to narcotics trafficking. Valencia said the currency did not belong to him and signed a Disclaimer of Currency form which was explained to him. Ramos was issued a receipt for the currency. The currency was subsequently counted and totaled $30,000 in the following denominations: 35 x $100 bills, 16 x $50 bills, 1,259 x $20 bills, 48 x $10 bills, and 8 x $5 bills. *Id*.

Ramos stated that he works for an auto body shop in Portland, Oregon, and that he made about $40,000 and about $55,000 in 2011. Ramos said the amount of money he makes depends on how many cars he works on. Ramos said he also makes money on the side by painting cars. Ramos said he painted three or four cars in 2012 and that he charges $2,000 to $3,000 to paint a car. *Id*. Valencia, Ramos, and the Explorer were released without further incident.

## PROCEDURAL BACKGROUND

As a result of the above incident, on September 24, 2013, the Government filed a civil

action *in rem* for the forfeiture of the defendant currency pursuant to 21 U.S.C. § 881(a)(7). (Doc. 1). On November 4, 2013, the government filed a declaration of publication indicating that a Notice of Civil Forfeiture was posted on the official internet government forfeiture site www.forfeiture.gov beginning October 3, 2013 through November 1, 2013, and proof of such publication was filed with the Court on as part of that notice.  (Doc. 3). On November 8, 2013, the Court issued a Warrant of Arrest of Articles in Rem for the Defendant Currency. (Doc. 5)

In addition to providing notice by publication, on November 8, 2013, Marcus Valencia was served with copies of the following: Verified Complaint for Forfeiture In Rem, Order Setting Mandatory Scheduling Conference, Standing Order, Notice of Availability of Voluntary Dispute Resolution, Notice of Availability of a Magistrate Judge, Order re Issuance of Warrant for Arrest, Warrant for Arrest of Articles In Rem, and notice of forfeiture letter dated November 8, 2013. The documents were served on Valencia at his last known address of 13608 NE 72nd Street #1, Vancouver, WA 98682, by First Class mail and certified mail no. 7006-2760-0000-0500-8614. Both parcels were returned to the United States Attorney's Office on November 22, 2013 marked as "Return to Sender, Insufficient Address, Unable to Forward." (Doc. 10-1, Exhibit A).

On November 8, 2013, Ignacio Estevez Osio, the registered owner of the vehicle, was also served with copies of the above listed documents, at his last known address of 3839 Pacific Avenue, Unit 201, Forest Grove, Oregon 97116, by First Class mail and certified mail no. 7006-2760-0000-0500-8607.  The certified mailing was signed on November 13, 2013. (Doc. 10-1, Exhibit B).  Neither Marcus Valencia or Ignacio Estevez Osio filed claims to the Defendant Currency.  However, on December 13 and 31, 2013 respectively, Alfonso Ramos filed a Claim and an Answer (hereinafter, "Claimant").  (Docs. 7 & 9).

A Scheduling Order was issued on January 17, 2014.  (Doc. 16).  As part of the prosecution of this case, the Government initiated discovery to determine why the Claimant, a

6

resident of Vancouver, Washington, was travelling with the Defendant Currency on the day of the vehicle stop.  In responses to Special Interrogatories, the Claimant indicated he was going to be "down visiting family" and brought the Defendant Currency along with him in case he found a "nice restored Impala." Response to Special Interrogatory No. 12 (Doc. 21-1, pg. 9).

At his deposition on May 8, 2014, however, Ramos gave another explanation.  On this date, he stated that he was traveling to visit Priscilla Thompson, a long time friend's house, to attend a family reunion. *Deposition of Alfonso Ramos, dated May 8,* (Doc. 21-1, pg. 14).  In Marcus Valencia's deposition on May 9, 2014, Valencia confirmed that he and Ramos were going to visit Priscilla Thompson. *Deposition of Marcus Valencia, dated May 8, 2014* (Doc. 21-1, pg. 25).

On September 22, 2014, the Plaintiff served Ramos with a Second Set of Interrogatories (Doc. 21-1, pg. 27). Interrogatory Number One asked Ramos to identify Ms. Thompson and provide her contact information. *Id*. at ¶ 6. On or about October 27, 2014, in his responses to those Interrogatories, Ramos refused to provide a response to Interrogatory Number One. (Doc. 21-1, pg. 37).  He responded: "Priscilla does not want to be involved in this matter." *Id*.

On December 5, 2014, the Government subsequently filed a Motion to Compel in an effort to obtain the information.  (Doc. 21).  On January 16, 2015, this Court granted the Motion to Compel and ordered that Ramos provide the information requested in Interrogatory Number One no later than February 3, 2015. (Doc. 25).  The Court advised Ramos that "any failure to comply with this order will subject him to the full range of discovery sanctions set forth in Rule 37(b)(2) of the Federal Rules of Civil Procedure, including, among others, the payment of attorneys' fees for the prevailing party, contempt of court, and entry of judgment against the disobedient party." *Id.at pg. 3*.

The Claimant did not provide the information as ordered, and the Government has filed

7

the instant Motion to Strike Ramon's Claim and Answer. (Doc. 26-2).  *Declaration of Assistant United States Attorney Jeffrey A. Spivak in Support of Motion to Strike* dated April 3, 2015 at pg. 2.  In response to the Motion to Strike, Ramos' attorney, Charles Pacheco, filed a declaration stating that he had made every attempt to have Mr. Ramos cooperate with the United States and provide the requested information, however, he has been "unable to secure [his] client's cooperation in following the Court's January 16, 2015 order." *Declaration of Charles Pacheco dated April 3, 2015 at pg. 1*.  (Doc. 27, pg. 1 at ¶¶ 3-4).  Mr. Pacheco further stated that he could not provide the Court with any legal basis for Mr. Ramos' refusal to provide the required information.  (*Id*. at para. 5).

On July 2, 2015, this Court issued an Order to Show Cause ordering that Mr. Ramos either provide the requested information, or in the alternative, file a response outlining his legal basis for his failure to comply with the Court's order.  (Doc. 30).  The Order to Show Cause advised Mr. Ramos that his failure to comply with the Court's order would result in the striking of his claim and answer, an entry of default judgment, and a final judgment of forfeiture against him. Ramos' attorney was ordered to serve the Order to Show Cause on Mr. Ramos, and file proof of service no later than July 10, 2015.  (Doc. 30, pg. 2).

On July 14, 2015, Mr. Pacheceo filed a declaration stating that he had attempted to contact Mr. Ramos via email and by phone to advise him of the Order to Show Cause and was unable to reach him. (Doc. 31).  He further informed the Court again that he was unable to provide the Court with any information to explain Mr. Ramos' failure to comply with the Court's order, nor was he able to provide the requested information.  *Id*.

## DISCUSSION

**A.    Legal Standard**

Federal Rule of Civil Procedure 55(b)(2) provides that a court has discretion to enter

8

default judgment against a party and provides as follows:

> (2)   By the Court.  In all other cases, the party must apply to the court for default judgment.  A default judgment may be entered against an infant or incompetent person only if represented by a general guardian, committee, conservator, or other like fiduciary who has appeared. If the party against whom default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 3 days before the hearing.  The court may conduct hearings or make referrals - preserving any federal statutory right to a jury trial - when, to enter or effectuate judgment, it needs to : (A) conduct an account; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter.

Upon default, the well-pleaded allegations of the complaint relating to liability are taken as true.  *Dundee Cement Co. v. Highway Pipe & Concrete Products, Inc*. 722 F.2d 1319, 1323 (7th Cir.  1983); *TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 917-918 (9th Cir. 1987).

In the context of an in rem forfeiture action, a court considering default judgment should also consider the procedural requirements set forth by the Civil Asset Forfeiture Reform Act of 2000, 18 U.S.C. § 983; the Supplemental Rules of Certain Admiralty and Maritime Claims ("Supplemental Rules"); and the court's Local Rules for Admiralty and in rem actions. *See, United States v. $191,910.00*, 16 F.3d 1051, 1069 (9th Cir.1994) (explaining that, because civil forfeiture is a "harsh and oppressive procedure which is not favored by the courts," the government carries the burden of demonstrating its strict adherence to procedural rules), *superseded by statute on other grounds*.

**B.     Procedural Requirements**

   **1.     *Sufficiency of the Complaint***

Pursuant to the Supplemental Rules, the Government must file a verified complaint that states the grounds for jurisdiction and venue, describes the property being forfeited, identifies the statute under which the forfeiture action is brought, and includes sufficient factual detail to

support a reasonable belief that the Government will be able to meet its burden of proof at trial. Fed.R.Civ.P. Supp. R. G(2).

With regard to the sufficiency of the factual detail of the verified complaint, the Government is not required to show a relationship between the proceeds of a drug crime and a specific drug transaction. Rather, circumstantial evidence may support the forfeiture of the proceeds of a drug crime. See *United States v. $30,670.00*, 403 F.3d 448, 467–70 (7th Cir. 2005) (concluding that the totality of the circumstances demonstrated that an airline passenger's cash hoard was connected to drug trafficking and subject to forfeiture); *United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004) (applying totality of the circumstances to determine that cash carried by airline passenger was the proceeds of, or traceable to, an illegal drug transaction).

The verified complaint states the grounds for subject matter jurisdiction, *in rem* jurisdiction and venue, describes the currency seized, and the circumstances surrounding the seizure, and identifies the relevant statutes. (Doc. 1). In the absence of assertion of interests in the Defendant Currency, the Court will not question the facts supporting its forfeiture. As alleged, the facts provide a sufficient connection between the defendant property and illegal drug activity to support a forfeiture.

2. ***Notice by Publication***

Subject to certain exceptions not present here, the Supplemental Rules also require the Government to publish notice of the forfeiture in a manner that is reasonably calculated to notify potential claimants of the action. Fed.R.Civ.P. Supp. R. G(4)(a)(iv). The content of the notice must describe the property with reasonable particularity, state the times to file a claim and to answer the complaint, and identify the name of the government attorney to be served with the claim and answer. Fed.R.Civ.P. Supp. R. G(4)(a) (ii)(A)-(C). This notice requirement may be satisfied by posting a notice on an official internet government forfeiture site for at least 30

10

consecutive days. Fed.R.Civ.P. Supp. R. G(4)(a)(iv) (C).

Here, publication occurred on the official internet government forfeiture site (www.forfeiture.gov) for 30 consecutive days beginning October 3, 2013 through November 1, 2013, and proof of such publication was filed with the Court on November 4, 2013. (Doc. 3). A copy of the notice was attached to the Declaration of Publication, and it described the Defendant Currency with reasonable particularity.  (Doc. 3, p. 3). The notice clearly stated the time requirements to file a claim and an answer. (Doc. 3, p. 3). Further, the notice provided the name of the attorney to be served with any claim and answer. (Doc. 13, p. 3). Thus, the Supplemental Rule's notice-content requirements have been satisfied. Fed. R. Civ. P. Supp. R. G(4)(ii)(A)-(C).

### 3. *Personal Notice*

When the Government knows the identity of the property owner, the Due Process Clause of the Fifth Amendment requires "the Government to make a greater effort to give him notice than otherwise would be mandated." *United States v. Real Property,* 135 F.3d 1312, 1315 (9th Cir.1998). In such cases, the Government must attempt to provide actual notice by means reasonably calculated under all circumstances to apprise the owner of the pendency of the forfeiture action. *Dusenbery v. United States,* 534 U.S. 161, 168 (2002); *see also* Fed.R.Civ.P. Supp. R. G(4)(b). "Reasonable notice, however, requires only that the [G]overnment attempt to provide actual notice; it does not require that the [G]overnment demonstrate that it was successful in providing actual notice." *Mesa Valderrama v. United States* 417 F.3d 1189, 1197 (11th Cir.2005); *Real Property,* 135 F.3d at 1316.

Supplemental Rule G(4)(b) mirrors this requirement, providing for notice to be sent by means reasonably calculated to reach the potential claimant. Fed. R. Civ. P. Supp. R. G(4)(b)(i). The notice must contain the following information: the date when the notice is sent; a deadline for filing a claim that is at least 25 days after the notice is sent; that an answer or a motion under Rule

11

12 must be filed no later than 21 days after the filing of the claim; and the name of the government attorney to be served with the claim and the answer. *Id*.

Here, the government attempted to provide notice of the forfeiture action to Marcus Valencia via United States First Class Mail and Certified Mail, and Ignacio Estevez Osio was served with the notice via Certified mail.  (Doc. 10, pg. 5-13).  Therefore, this requirement is met.

### 4. *The Time to File a Claim or an Answer*

Pursuant to the Supplemental Rules, any person who asserts an interest in or a right in a forfeiture action must file a claim with the Court within the time specified by the direct notice. Fed.R.Civ.P. Supp. G(4)(b)(ii)(B), (5)(a)(ii)(A).  Failure to comply with the procedural requirements for opposing the forfeiture precludes a person from establishing standing in the forfeiture proceeding. *Real Property,* 135 F.3d at 1317.  Neither Valencia or Osio filed a claim. Alfonso Ramos filed a claim on December 13, 2013. (Doc. 7).  Therefore, this requirement is met.

### 5. *The Motion to Strike Alfonso Ramos' Claim and Answer*

The Government argues that Alfonso Ramos' Claim and Answer should be stricken because he failed to comply with this Court's discovery orders.  The Court recognizes that this is a harsh sanction.  However, after careful consideration of the circumstances, the Court finds that the striking of the Claimant's Answer and Claim is warranted.

If a party fails to serve answers or objections to interrogatories submitted under Rule 33 the court may order sanctions. Fed. R. Civ. P. 37(d)(1)(A).  The allowable sanctions include, *inter alia,* "striking pleadings in whole or in part." Fed. R. Civ. P. 37(b)(2)(A)(iii).  Courts have discretion in imposing sanctions. *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir. 1997).  In determining whether to dismiss an action or enter default pursuant to Rule 37(b)(2)(C), a district court must consider five factors:

(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the [opposing party]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.' *Payne,* 121 F.3d at 507, *quoting Malone v. U.S. Postal Serv.,* 833 F.2d 128, 130 (9th Cir.1987). Where a court order is violated, the first and second factors will favor sanctions and the fourth will cut against them. *Id.*

*Computer Task Group, Inc. v. Brotby,* 364 F.3d 1112, 1115 (9th Cir. 2004).

The Ninth Circuit Court of Appeals has stated that this multi-factor test is "not mechanical," *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills,* 482 F.3d 1091, 1096 (9th Cir. 2007), and the court "need not make explicit findings regarding each of these factors," *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006). Rather, the test "provides the district court with a way to think about what to do, not a set of conditions precedent for sanctions or a script that the district court must follow." *Conn. Gen. Life Ins. Co.,* 482 F.3d at 1096. "What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether discovery violations threaten to interfere with the rightful decision of the case." *Id.* at 1097.

Courts may also impose sanctions, including terminating sanctions, as part of their inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" or based on a failure to comply with court orders. *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991); *Pagtalunan v. Galazza*, 291 F.3d 639, 642 (9th Cir. 2002). In both instances, the Ninth Circuit has held that the same five-factor test utilized in the context of Rule 37 sanctions applies. *Leon,* 464 F. 3d at 958 n. 4; *Pagtalunan*, 291 F.3d at 642.

Here, Claimant Ramos did not provide the requested discovery to the Government and failed to follow a court order requiring him to do so. (Doc. 25). The Claimant refused to provide the requested information and his attorney offered no legal basis or objection to producing the information. (Doc. 27). The Court issued an Order to Show Cause and offered the Claimant *another* opportunity to provide the information, or explain why the information should not be given to the government. (Doc. 30). Mr. Ramos again failed to respond to the order, and in fact, could not be located by his attorney despite numerous attempts to do so. (Doc. 31).

In the discovery context, "[a] district court is not constrained to impose the least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances." *Chrysler Corp. v. Carey*, 186 F.3d 1016, 1022 (8th Cir. 1999). "Where the drastic sanctions of dismissal or default are imposed . . . the losing party's non-compliance must be due to willfulness, fault or bad faith." *Jorgensen v. Cassiday*, 320 F. 3d 906 (9th Cir. 2003) (quoting, *Hyde*, 24 F. 3d 1162, 1167 (9th Cir. 1994); *Fjelstad v. American Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir. 1985). "[D]isobedient conduct not shown to be outside the control of the litigant is all that is required to demonstrate willfulness, bad faith, or fault." *Hyde*, 24 F. 3d at 1167; *Fjelstad*, 762 F. 2d at 1341.  A single willful violation may suffice depending on the circumstances. *Valley Engineers, Inc. v. Electric Engineering Co*., 158 F.3d 1051, 1056 (9th Cir. 1998), cert. denied, 526 U.S. 1064, 119 S.Ct. 1455 (1999); *see Ortiz-Rivera v. Municipal Government of Toa Alta*, 214 F.R.D. 51, 57 (D. P.R. 2003) (disobedience of court orders in and of itself constitutes extreme misconduct and warrants dismissal).

In this case, it is clear that the Claimant's conduct is willful.  He has disobeyed two Court orders even when he was advised that failure to comply with the Court's orders could result in default being entered against him. (Docs. 25 and 30).  Moreover, the Court has considered the public policy favoring disposition of cases on their merits, as well as the availability of less drastic sanctions, including monetary sanctions and prohibiting the Claimant from introducing this testimony at trial.  However, here, the discovery sought is contact information for a witness that addresses the veracity of the Claimant's testimony given during a deposition.  The Government has a right to contact this witness, and the inability to do so will irreparably prejudice the United State's ability to assess the Claimant's credibility.  Finally, it also appears that Mr. Ramos has abandoned his case. In addition to failing to produce the required discovery, and violating two court orders, he has not been in contact with his attorney.  Thus, there is no

lesser appropriate sanction.

Based on the above, the Court finds that Mr. Ramos willfully violated this Court's discovery order and has also abandoned his claim as he has failed to prosecute this action. *See*, *United States v. Approximately $88,125.00 in United States Currency*, 2013 WL 310062 (W.D.N.C., Jan. 13, 2013) (Failure to produce discovery and failure to attend pretrial conference constitutes abandonment); *United States v. Reyes*, 2010 WL 547235 (E.D. Texas, Feb. 10, 2010) (Failure to attend ancillary forfeiture hearing resulted in dismissal based on abandonment of claims.). Accordingly, this Court will strike Mr. Ramos' Claim and Answer pursuant to Fed. R. Civ. P. 37(b)(2)(A)(iii) and direct the Clerk of the Court to enter default against Mr. Ramos.

### C.     *The Eitel Factors Weigh in Favor of Granting Default Judgment*

The Government seeks judgment against the interests of Alfonso Ramos, Marcus Valencia and Esteves Osio, and also seeks final judgment of forfeiture against all other unknown potential claimants. The Supplemental Rules do not provide a procedure to seek default judgment in an action *in rem.* Supplemental Rule A provides: "The Federal Rules of Civil Procedure also apply to the foregoing proceedings except to the extent that they are inconsistent with these Supplemental Rules."

When considering whether to enter default judgment under Fed. R. Civ. P. 55, courts consider the following factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the compliant; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy of favoring decisions on the merits. *Eitel v. McCool,* 782 F.2d 1470, 1471–72 (9th Cit.1986).

The discretionary *Eitel* factors outlined above favor granting the Government's motion for default judgment. First, the Government would be prejudiced by the denial of its motion,

spending additional time and effort litigating an action in which the Claimant has ignored Court orders and has abandoned his claim. Second, the Government's claims appear to have merit. Third, as set forth above, the Government has adhered to the procedural requirements of a forfeiture action *in rem,* including the filing of a sufficient complaint. Fourth, the currency that was seized and subject to forfeiture is not of such substantial value as to warrant denial of the Government's motion. Fifth, there are no genuine disputed issues of material fact. Sixth, there is no evidence that the abandonment is due to excusable neglect. Finally, although merits-based decisions are always preferred, it is not practical, as here, where claimant has abandoned his claim and willfully disobeyed Court orders. Accordingly, there is no impediment to default judgment sought by the Government and the Court will grant the motion.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

**ORDER**

For the reasons discussed above, this Court ORDERS that:

1. The Government's Motion to Strike the Claim and Answer of Alfonso Ramos and the Motion for Default Judgment and Final Judgment of Forfeiture against Alfonso Ramos, Marcus Valencia and Ignacio Estevez Osio (Doc. 26) is GRANTED;

2. Alfonso Ramos' Claim and Answer (Docs. 7 & 9) is STRICKEN;

3. The Clerk of the Court shall enter default against Alfonso Ramos;

4. Final judgment of forfeiture pursuant to 21 U.S.C. § 881(a)(6), forfeiting all right, title, and interest in the Defendant Currency to the United States is GRANTED;

5. Within ten (10) days, the United States shall submit a proposed final judgment of forfeiture consistent with this order; and

6. In light of the above, the pretrial conference set for September 11, 2015 and the trial set for November 17, 2015 (Doc. 29) are VACATED.

IT IS SO ORDERED.

Dated:   **August 26, 2015**              /s/ Gary S. Austin
                                         UNITED STATES MAGISTRATE JUDGE